**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| MICHAEL R. ROEHRS, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | No. 3:05-CV-829-M |
| | § | |
| CONESYS, INC., RONALD E. SPIRE, J-TECH, INC., JOHN POLLOCK, and JULIE BARKER, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' Motion for Summary Judgment. For the reasons stated below, the Court **GRANTS** the Motion. Also before the Court is Defendants' Motion to Strike Plaintiff's Appendix to his supplemental brief. Plaintiff filed a supplemental brief, pursuant to the Court's oral Order given at a hearing on April 23, 2007. The Court did not authorize the submission of additional evidence, and Plaintiff has not moved the Court for leave to file the same. Accordingly, Defendants' Motion to Strike is **GRANTED**, and Plaintiff's supplemental appendix is **STRICKEN** from the summary judgment record.

**BACKGROUND**

This is a suit brought by Plaintiff Michael Roehrs against Defendants for tortious interference with a contract, tortious interference with a prospective economic relationship, conspiracy, and aiding and abetting. The suit arises out of a dispute between Plaintiff, as the former majority shareholder of Fiber Systems International, Inc. ("FSI"), and the minority shareholders of FSI ("Minority Group"), over the proper ownership and direction of that

company. In particular, Plaintiff and the Minority Group differed over whether FSI should form a relationship with Defendant Conesys, Inc. ("Conesys").[1] The Minority Group favored such a relationship; Plaintiff opposed it.

After protracted litigation between Plaintiff and the Minority Group regarding matters only tangentially relevant here, three agreements were reached in July and August 2003: a Rule 11 Agreement, a Stock Purchase Agreement ("SPA"), and a Compromise and Settlement Agreement ("CSA"). The most relevant provisions of the SPA and CSA ("SPA/CSA") provided that Plaintiff would have ninety days within which to finance his purchase of the Minority Group's shares of FSI at a greatly reduced price,[2] and that, should he fail, the Minority Group would have the same opportunity to purchase Plaintiff's shares at the same reduction in price. If neither succeeded, Timothy Zeiger—the attorney ad litem appointed by the Collin County District Court to run FSI—would sell FSI.

On October 8, 2003, Plaintiff and CCR, Ltd.[3] initiated arbitration proceedings against the Minority Group pursuant to the arbitration provisions of the CSA. Zeiger was the arbitrator, and Plaintiff alleged, among other things, that the Minority Group interfered with his ability to finance the purchase of FSI by failing to comply with the due diligence requirements of the SPA. In an Arbitration Award, dated December 4, 2003, but effective October 20, 2003,[4] the arbitrator

---

[1] Conesys is a holding company that owns Defendant J-Tech, Inc., and Defendant Ronald Spire was an agent of Conesys in all relevant matters. Plaintiff no longer asserts claims against Defendants John Pollock and Julie Barker, except to preserve his right to appeal this Court's Order of December 14, 2005.

[2] The parties agree that the price was approximately half of the value of the shares.

[3] Plaintiff held his interest in FSI in an off-shore holding company called CCR, Ltd.

[4] The arbitrator apparently made an initial oral ruling at the hearing on October 20, 2003. The later-issued opinion was dated December 4, 2003, but noted that it was effective October 20, 2003.

denied Plaintiff's claim for damages, but extended the time for his opportunity to purchase the Minority Group's shares of FSI by three weeks. In an effort to finance the purchase, Plaintiff contacted several companies, including Amphenol, Inc. ("Amphenol") and Southwest Mezzanine Investments ("SMI").

On November 6, 2003, Ronald Spire, an agent of Conesys,[5] called Amphenol to discuss Conesys's purported right of first refusal with respect to FSI stock.[6] Plaintiff claims that this call, along with efforts by the Minority Group to interfere with due diligence, prevented Plaintiff's potential deal with Amphenol from going through. Plaintiff also claims that the Minority Group's efforts sabotaged his prospective business relationship with SMI. Ultimately, in late November 2003, Plaintiff financed the purchase of the Minority Group's shares of FSI, through Red River Ventures, and Amphenol purchased FSI in 2005. Plaintiff claims that had either the Amphenol or SMI deals come to fruition in 2003, he would have profited more from the overall transaction.

## STANDARD OF REVIEW

Summary judgment is warranted when the facts as reflected in the pleadings, affidavits, and other summary judgment evidence show that no reasonable trier of fact could find for the nonmoving party as to any material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "The moving party bears the initial burden of identifying those

---

[5] Defendants concede, solely for the purposes of the Motion for Summary Judgment, that Ronald Spire was an agent of Conesys.

[6] On March 28, 2002, FSI sold Conesys 4,985 shares of FSI stock, approximately ten percent of the company. Plaintiff contends that this transaction was fraudulent.

portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Props., Inc. v. Potomac Ins.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 322–25). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

The nonmovant is then required to go beyond the pleadings and designate specific facts proving that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). That party may not rest on conclusory allegations or denials in its pleadings that are unsupported by specific facts. FED. R. CIV. P. 56(e). The court must review all evidence in the record, giving credence to evidence favoring the nonmovant as well as "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses," and disregarding evidence favorable to the movant that the jury would not be required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 152 (2000). Further, "the court must draw all justifiable inferences in favor of the nonmovant." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 338 (5th Cir. 2005) (citing *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993)).

In determining whether genuine issues of material fact exist, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists." *Lynch*, 140 F.3d at 625. "If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir. 1991). However, in

the absence of proof, a court will not conclude that the nonmoving party could prove the required facts. *Lynch*, 140 F.3d at 625. Further, the nonmoving party must do more than simply show some "metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

**ANALYSIS**

Plaintiff asserts four causes of action: (1) tortious interference with a contract, (2) tortious interference with a prospective economic relationship, (3) civil conspiracy, and (4) aiding and abetting. The first two claims are based upon the allegedly wrongful conduct of Defendants in interfering with Plaintiff's negotiations with Amphenol. The latter two claims seek to hold Defendants accountable for an alleged plan between Defendants and the Minority Group to tortiously interfere with the SPA/CSA and with two prospective economic relationships—those between Plaintiff and both Amphenol and SMI. Both civil conspiracy and aiding and abetting are premised on an underlying tort. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 (Tex. 2001); *Dockery v. America's Platinum Privileges, Inc.*, No. 3:03-CV-1901, 2004 WL 1196067, at *7 (N.D. Tex. 2004) (Lynn, J.). The alleged underlying tort with regard to Amphenol is based upon the phone call from Spire to Mullett and the Minority Group's failure to comply with the due diligence requirements of the SPA/CSA. For SMI, the alleged underlying tort is founded only the Minority Group's conduct. As damages, Plaintiff seeks the profits lost on the deals with Amphenol and SMI, as well as compensation for mental anguish.

Defendants move for summary judgment on a number of grounds. The Court finds it necessary to address only certain of those grounds, primarily collateral estoppel and the challenge to the sufficiency of the evidence supporting Plaintiff's damages for the profits he claims to have lost on a prospective deal with Amphenol in 2003.

*A.*

Defendants argue that Plaintiff's claims of conspiracy and aiding and abetting fail insofar as they are premised on the underlying tort of tortious interference with a contract, because the Minority Group, Defendants' alleged co-conspirator, was a party to the SPA/CSA, the contract allegedly interfered with, and a party cannot tortiously interfere with its own contract. *Holloway v. Skinner*, 898 S.W.2d 793, 794–95 (Tex. 1995) ("the person who induces the breach cannot be a contracting party"). Plaintiff does not respond. Defendants' argument is correct. Thus, the Court **GRANTS** Defendant's Motion for Summary Judgment as to the claims that Defendants conspired with and aided and abetted the Minority Group in tortiously interfering with a contract.

*B.*

Defendants contend that collateral estoppel bars Plaintiff's claims of civil conspiracy and aiding and abetting to tortiously interfere with a prospective economic relationship insofar as they are premised on the Minority Group's conduct with respect to SMI. Specifically, Defendants contend that the Arbitration Award is issue preclusive in its finding that the Minority Group's conduct did not cause Plaintiff's prospective deal with SMI to fail.

Plaintiff initiated arbitration proceedings against the Minority Group on October 8, 2003, alleging violations of various provisions of the SPA. Generally, Plaintiff cited the Minority Group's failure to cooperate in due diligence performed by companies potentially interested in financing the SPA purchase, including failing to provide information and access. The arbitrator signed the Arbitration Award on December 4, 2003, effective October 20, 2003, granting Plaintiff an extension of time to finance the SPA purchase, but he denied Plaintiff damages, finding that:

> no credible evidence was presented identifying any particular lending source that in reasonable probability would have financed the acquisition of the Minority Group's shares on behalf of Michael Roehrs but did not do so because of failure of the Minority Group to provide required due diligence information. In fact, it was undisputed that one potential source, Valhalla Advisors, LP, was provided all of the due diligence information requested and declined the investment opportunity.

Valhalla Advisors, LP was hired by SMI to conduct due diligence on behalf of SMI. The import of the arbitrator's decision is that Valhalla Advisors, LP—*i.e.*, SMI—got the information it requested, but elected not to proceed.

"In order to invoke the doctrine of collateral estoppel, a party must establish '(1) the facts sought to be litigated in the first action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action.'" *Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 721 (Tex. 1991) (quoting *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 818 (Tex. 1984)). Importantly, "collateral estoppel only precludes the relitigation of identical issues of fact or law which were actually litigated and essential to the prior judgment." *Id.* at 721–22. Here, Defendants argue that the Arbitration Award collaterally estops Plaintiff from claiming that the Minority Group's failure to comply with the due diligence requirements of the SPA/CSA caused Plaintiff's prospective economic relationship with SMI to fail. The Court finds collateral estoppel applicable to the claims based upon the prospective deal with SMI, but inappropriate as to the balance of Plaintiff's claims. The arbitrator specifically determined that the Minority Group's conduct—the

same conduct relied on in the claims asserted here—was not the cause of the failure of the prospective relationship between Plaintiff and SMI. Because the instant suit involves the identical issue, Plaintiff is collaterally estopped from alleging that Defendants are jointly and severally liable for the Minority Group's interference with the SMI deal. The same cannot be said of Plaintiff's claim regarding the Amphenol deal, however. The relevant issue with regard to Amphenol is whether the *combined* acts of Defendants and the Minority Group caused the prospective Amphenol deal to fail, an issue which was not before the arbitrator. Collateral estoppel is thus inappropriate on that claim.

Plaintiff's objections to the application of collateral estoppel to the SMI deal are without merit. Plaintiff first contends that collateral estoppel is inappropriate because there was not an identity between the parties in the current litigation and the SPA Arbitration. Although true, Plaintiff's argument does not account for the derivative-liability application of the requirement of identity or privity: "Privity in this sense means a mutual or successive relationship to the same rights of property." *Lemon v. Spann*, 633 S.W.2d 568, 570 (Tex. App.—Texarkana 1982, writ ref'd n.r.e.). Thus, "where the rights or liabilities of a party are derivative, a judgment binding a party from whom the rights or liabilities are derived may be set up as a bar in a second suit." *Id.*; *see also Kale v. Palmer*, 791 S.W.2d 628, 634 (Tex. App.—Beaumont 1990, writ denied). Here, Defendants' alleged liability is derivative of the Minority Group's liability, which was adjudicated at the SPA Arbitration, to which Plaintiff was a party. Accordingly, the privity requirement of collateral estoppel is satisfied.

Plaintiff next argues that the SPA/CSA did not contemplate the submission of the tort claims in this suit to the arbitrator. Here, there is no dispute that the contract required the

arbitration of issues related to the Minority Group's compliance with the due diligence requirements of the SPA/CSA. Plaintiff submitted those issues as well as a claim for associated damages to the arbitrator. The arbitration provision of the SPA/CSA states that "[t]he Parties hereto agree that should any dispute between the Parties arise concerning the terms, conditions, compliance, or failure of compliance with this agreement, then the Parties must present the matter to [the arbitrator]." On its face, the arbitration clause mandates the submission of the damages claim to the arbitrator, and Plaintiff does not attempt to explain otherwise. Furthermore, as detailed below, the arbitration provision provided for the appeal of an award on the basis that the arbitrator exceed his powers. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 171.088(a)(3). Plaintiff did not appeal the arbitrator's power to rule upon the damage claim of Plaintiff.

Plaintiff's next argument is that the issues before the arbitrator were not fully and fairly litigated because third-party discovery was not permitted, making it difficult to investigate Defendants' involvement, and because the arbitrator's decision was final and not subject to review. The arbitration provision is silent as to permissible discovery. Plaintiff adduces no evidence that any demand for discovery was made or that the arbitrator limited attempts at such discovery. Even assuming that third-party discovery was not permitted at the SPA arbitration, it is of no moment, as Plaintiff makes no showing that he was prejudiced by a lack of discovery. *See Univ. Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1137–38 (5th Cir. 1991) ("A district court in exercising its discretion must carefully consider whether procedural differences between arbitration and the district court proceedings might prejudice the party challenging the use of . . . collateral estoppel."). In fact, Plaintiff's claims here pertaining to the SMI deal rely exclusively

on the conduct of the Minority Group; that is, Plaintiff seeks to hold Defendants liable for the Minority Group's interference with the SMI deal. An arbitration need not afford any more than "the basic elements of adjudicatory procedure" to be issue preclusive. *Id.* at 1137.

Plaintiff's next challenge to the fairness of the SPA Arbitration also fails, as the arbitration provision of the SPA/CSA specifically provided for review of an arbitration award pursuant to § 171.088 of the Texas Civil Practice and Remedies Code. That provision allows for the vacating of an award if the arbitrator exceeded his powers, refused to hear evidence material to the dispute, or conducted the arbitration hearing in a manner that substantially prejudiced the rights of a party. TEX. CIV. PRAC. & REM. CODE ANN. § 171.088(a)(3). Finally, the Fifth Circuit has dismissed the concern that "arbitral findings typically lack the supervisory scrutiny of authoritative review" by assuming "that rational actors fearing future disagreement would not contract for a biased forum to settle their differences." *J-Chem*, 946 F.2d at 1137.

Plaintiff's final argument is a plea of unfairness, asking that the Court exercise its discretion not to apply collateral estoppel even if legally appropriate. To establish that the Court has such discretion, Plaintiff cites a number of cases that rely on the Supreme Court's decision in *Parklane Hosiery Company v. Shore*, 439 U.S. 322 (1979). In *Parklane Hosiery*, the Supreme Court considered whether the *offensive* use of collateral estoppel was appropriate. *Id.* at 331. Rather than precluding offensive collateral estoppel altogether, it afforded district courts broad discretion in applying it. *Id.* Accordingly, the Court announced the general rule that "where a plaintiff could easily have joined in the earlier action or where . . . the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." *Id.* The instant case involves defensive, rather than offensive, collateral

estoppel.[7] Without deciding whether it has such discretion, the Court assumes that the unfairness exception applies to defensive collateral estoppel, but rejects Plaintiff's invocation of it. Plaintiff argues that the nature of the SPA Arbitration was unique and should not form the basis for issue preclusion: it was an expedited proceeding conducted without third-party discovery. Notwithstanding Plaintiff's protest, the Court notes that nothing contained in the arbitration provision of the SPA/CSA limited the duration or scope of discovery in the SPA Arbitration. Plaintiff apparently did not object to either alleged deficiency at the arbitration or on appeal.

The Court finds that Plaintiff is collaterally estopped from asserting that SMI would have entered into a business or contractual relationship with Plaintiff but for the conduct of the Minority Group. This preclusion effectively bars Plaintiff's claims of civil conspiracy and aiding and abetting based upon the SMI negotiations.

*C.*

Defendants move for summary judgment as to all of Plaintiff's claims, arguing that Plaintiff's damage models for lost profits are too speculative to be submitted to a jury. "Recovery for lost profits does not require that the loss be susceptible to exact calculation. However, the injured party must do more than show that it suffered some lost profits. The loss amount must be shown by competent evidence with reasonable certainty. This is a fact-intensive determination. At a minimum, opinions or lost-profit estimates must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 503 (Tex. 2001) (citations omitted); *see also Burkhart Grob Luft und*

[7] Defensive collateral estoppel precludes a plaintiff from relitigating a fact or issue litigated and lost against another defendant. *Parklane Hosiery*, 439 U.S. at 329. Offensive collateral estoppel precludes a defendant from relitigating a fact or issue litigated and lost against another plaintiff. *Id.*

*Raumfahrt GmbH & Co. KG v. E-Systems, Inc.*, 257 F.3d 461, 467 (5th Cir. 2001) ("Both the fact of lost profits, and their amount, must be established with reasonable certainty."). "Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect." *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994).

In *Gonzalez v. Gutierrez*, the plaintiff claimed that he had lost profits on account of the defendant's interference with his ability to bid for jobs at, and to acquire new leases from, the Laredo International Airport. 694 S.W.2d 384, 386–87 (Tex. App.—San Antonio 1985, no writ). The plaintiff's damage model was supported exclusively by his testimony regarding past profits, presumably from jobs and leases at the airport. *Id.* at 389–90. The court found the evidence insufficient to establish that "the plaintiff would have been awarded a specific contract, bid, or lease," or "that his net earnings would have been a certain amount," or "what his specific pecuniary losses were." *Id.* at 390. In short, the "subjective opinion of the interested party" was inadequate proof of loss. *Id.* The result was similar in *Lovelace v. Sabine Consolidated, Inc.*, 733 S.W.2d 648 (Tex. App.—Houston [14th Dist.] 1987, writ denied). The plaintiff's president testified that the defendant's actions prevented the plaintiff from offering what would have been the low bid in an auction for a contract, and that the contract was worth "between $400,000 and $500,000 net after overhead and everything." *Id.* at 655. The court found this evidence of lost profits "minuscule, consisting of speculation stacked upon speculation," because no objective

data supported the conclusion that with reasonable certainty the plaintiff would have been awarded the contract or that the contract would have been profitable. *Id.* at 656. By contrast, the Fifth Circuit found sufficient evidence of lost profits in *DSC Communications Corporation v. Next Level Communications*, 107 F.3d 322, 329 (5th Cir. 1997). There, the plaintiff company alleged that former employees had misappropriated plans for an advanced version of one of the company's successful telecommunications products, which hindered the company's development and marketing of the advanced product. *Id.* The defendant attacked the sufficiency of the evidence, primarily attacking the speculative nature of the damage model, which hinged on future sales in a future market. *Id.* In affirming the sufficiency of the evidence of the fact of damages, the Fifth Circuit noted that:

> the intensive market research [that the plaintiff] presented at trial, coupled with the known history of the telecommunications industry and the success of the [predecessor] product, established with sufficient certainty that [the new] technology is likely to generate significant profits. Even if a product is not yet fully developed, a plaintiff is not prevented from recovering future lost profits if it was hindered in developing that product, and the evidence shows the eventual completion and success of that product is probable. As well, [the plaintiff] has traditionally been a leader in producing technology used in telecommunications. Its history of strong performance is indicative of the likely success of this revolutionary new product.

*Id.* The court ruled similarly with respect to the amount of the plaintiff's claimed damages, finding the damage expert's "predictions [based] on data obtained from respected sources in the telecommunications market" sufficient to support a recovery. *Id.* at 330.

In this case, Plaintiff's damage models account for prospective business relationships with two companies—Amphenol and SMI—that Defendants' interference allegedly sabotaged. The Court will not consider Defendants' challenges to the SMI damages model as the Court has found collateral estoppel bars Plaintiff's claims for damages relating to SMI.

To understand Plaintiff's damage models with respect to Amphenol, it is necessary to understand the transactions that actually occurred. By virtue of the SPA/CSA, Plaintiff had ninety days within which to purchase the Minority Group's shares of FSI, at essentially half their market value. During that period, Plaintiff courted both Amphenol and Red River, among others. Although the record is inconclusive, it appears that Amphenol's primary interest during its discussions in 2003 with Plaintiff was to purchase FSI, rather than to finance Plaintiff's purchase of the Minority Group's shares. Plaintiff claims that it became apparent toward the end of his ninety-day finance period that the prospective deal with Amphenol had been sabotaged, and that he was forced to accept the offer from Red River to finance the acquisition of the Minority Group's shares. Red River provided approximately five million dollars to Plaintiff in exchange for equity in FSI. In 2005, Amphenol purchased FSI for approximately thirty million dollars. Plaintiff received approximately sixteen million dollars for his interest in FSI, and Red River received approximately fifteen million dollars for its interest.

Plaintiff proposes two models to explain how he might have profited more from the final sale of FSI, had the prospective Amphenol deal succeeded in 2003. The first model argues that but for Defendants' interference, Amphenol would have purchased FSI for approximately thirty million dollars in December 2003, as it did in February 2005. In support, Plaintiff offers his declaration, wherein he calculates his lost profits assuming the later purchase amount. The second model uses the Whitley-Penn Report's valuation of FSI in 2003—approximately twenty-four million dollars—as a starting point for the same calculation.[8] Although deposed, Amphenol's representative, Craig Mullett, did not testify as to what sum, if any, Amphenol

---

[8] The Whitley-Penn Report assessed FSI's value on July 24, 2003, per the request of Zieger.

would have paid for FSI in 2003.

The Court finds Plaintiff's models too speculative to support an award of lost profits: they are insufficient to establish either the fact or amount of damages. The principal failure of the models is that they do not account for the differences between Amphenol's actual purchase in 2005 and potential purchase in 2003. In 2003, Plaintiff owned approximately half of FSI and needed financing to purchase the remaining half at half price. In 2005, the ownership structure was drastically different, with each half owned by a separate person or group, neither of which was under a contractual obligation to sell its shares at half price. Accordingly, Amphenol's willingness to pay a certain amount in 2005 is irrelevant in determining what it might have paid in 2003.[9] In fact, no evidence establishes what Amphenol might have paid. Plaintiff proffers testimony from Mullett indicating that Amphenol was interested in FSI in 2003, that it was aware of the Red River deal, and that it believed it could "beat" that deal. There is no explanation of what Mullett meant by beating the deal. Plaintiff's counsel explained at the hearing on June 27, 2007, that Mullett's testimony indicates that Amphenol wanted FSI, would pay fair market value for it, and did not care how the money was distributed between Plaintiff and the Minority Group. This explanation is without evidentiary support and at odds with common sense. In late 2003, Plaintiff had a short time to capitalize upon the SPA by purchasing the Minority Group's shares at a reduced price, but did not have the capital, and was forced to exchange substantial equity in FSI for the necessary funds. Had Plaintiff not purchased the shares, the Minority Group would have had the same opportunity to purchase his shares, for a similarly reduced price. Plaintiff's

[9] Further proof of this point is the concession by Plaintiff's counsel at the hearing on June 27, 2007, that Amphenol's 2004 offer of twenty-five million dollars was rejected by Plaintiff only because Red River, as an equity holder in FSI following the 2003 financing deal, drove a hard bargain to drive the offer up to thirty million dollars.

assumption that Amphenol would simply pay full fare for the Minority Group's shares—which were already discounted by the terms of the SPA/CSA and, as a minority interest, would be further reduced in value—without attempting to realize some benefit from its investment, is purely speculative. Thus, there is simply no data from which a jury might reasonably deduce the amount Amphenol would have paid in 2003 for FSI. This is confirmed by the inability of Amphenol's representative, in deposition, to provide even a broad range of prices that Amphenol was considering.

Plaintiff's models are further complicated by the fact that Defendants' alleged interference did not prevent Plaintiff from purchasing the Minority Group's shares: Plaintiff structured a deal with Red River that allowed him to profit handsomely in 2005. The relevant issue in determining the sufficiency of proof of damages is not simply whether or not Amphenol would have purchased FSI in 2003, but on what terms. The terms of such a deal are crucial in determining not only the amount of lost profits, but whether Plaintiff was actually harmed in the first instance. If, for example, Amphenol offered Plaintiff twenty million dollars in 2003 for FSI, it is not clear that he would have suffered any loss compared to the sixteen million dollar profit actually realized, because approximately five million dollars of the twenty would go toward purchasing the Minority Group's shares.[10] Thus, it is impossible to determine whether Plaintiff was actually injured, given the ultimate success of the Red River deal.

For the reasons set forth above, summary judgment is **GRANTED** on all of Plaintiff's

---

[10] Plaintiff's models assume that Amphenol would in 2003, as it did in 2005, purchase FSI with part cash and part equity in Amphenol. In the 2005 transaction, Plaintiff acquired six million dollars in shares of Amphenol, and later sold those shares in the spring of 2006 for a profit of nearly fifty percent. Plaintiff thus reasons that whatever the sale price in 2003, the actual profits would be much higher accounting for profit on the eventual sale of the Amphenol stock. Even accounting for this speculative assumption, there is still a paucity of evidence establishing what Amphenol might have paid in 2003, and thus it cannot be said with any certainty that Plaintiff was in fact injured by the alleged interference.

claims relating to a deal with Amphenol not going forward in 2003.

*D.*

Defendants additionally contest the availability of mental anguish damages in Texas for Plaintiff's tortious interference claims. The argument was first raised in Defendants' Reply. As a general matter, the Court will not consider arguments first raised in a reply. *Lopez v. City of Dallas*, No. 3:03-CV-2223-M, 2006 WL 1450520, at *8 n.16 (N.D. Tex. May 24, 2006) (Lynn, J.). However, in this case, Plaintiff submitted additional briefing following Defendants' Reply, and the Court heard extensive oral argument on the subject. Accordingly, consideration of the challenge is proper. *See also Love v. Nat'l Med. Enters.*, 230 F.3d 765, 770–71 (5th Cir. 2000) ("it is well-settled that a district court may grant summary judgment *sua sponte*, 'so long as the losing party has ten days notice to come forward with all of its evidence' in opposition to summary judgment") (quoting *Washington v. Resolution Trust Corp.*, 68 F.3d 935, 939 (5th Cir. 1995)); *Nat'l Fire Ins. Co. v. Entm't Specialty Ins. Servs.*, 485 F. Supp. 2d 737, 739 (N.D. Tex. 2007) (Lynn, J.); FED. R. CIV. P. 56(c).

The Texas Courts of Appeals have divided over the question of whether mental anguish damages are recoverable for tortious interference claims. *Crisalli v. Willis Re Inc.*, No. 4:05-CV-272, 2006 WL 722121, at *3 n.2 (E.D. Tex. Mar. 20, 2007) (Schell, J.). Plaintiff contends that the Fifth Circuit's decision in *Sulzer Carbomedics, Inc. v. Oregon Cardio-Devices, Inc.* was an "*Erie* guess"[11] that such damages are in fact recoverable under Texas law for tortious interference. 257 F.3d 449, 455–56 (5th Cir. 2001) (Lynn, J.). The Court disagrees. The court

[11] "[I]t is the duty of the federal court to determine as best it can, what the highest court of the state would decide." *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

in *Sulzer* referenced mental anguish damages only to illustrate that "the measure of damages for breach of contract and tortious interference with a contract are not necessarily the same." *Id.* Although citing intermediate appellate cases, it stated that Texas law allows recovery of mental anguish damages for tortious interference with a contract, the court recognized that even more recent authority supported the contrary proposition. *Id.* (citing *Hallmark v. Hand*, 885 S.W.2d 471, 481 (Tex. App.—El Paso 1994, writ denied)). Perhaps most significantly, the *Sulzer* court did not purport to resolve the conflict among the Texas appellate courts by making an *Erie* guess; its reference to the conflict was merely illustrative.

Because the Texas Supreme Court has not expressly ruled upon this issue, it is this Court's duty to guess how it would. Based upon language in a recent opinion of the Texas Supreme Court, the Court concludes that the Texas Supreme Court would hold that mental anguish damages are not recoverable in tortious interference cases. *See Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 818 (Tex. 2005). In *Creditwatch*, the Texas Supreme Court stated in passing that "Texas law already recognizes claims for wrongful eviction and tortious interference with contract, neither of which allow mental anguish damages." *Id.* As Judge Schell concluded in *Crisalli*, this Court concludes that "*Creditwatch* appears to resolve [the] conflict among the [Texas appellate] courts." 2006 WL 722121, at *3 n.2.

Summary judgment is therefore **GRANTED** on Plaintiff's claim for mental anguish damages on the basis of tortious interference.

**CONCLUSION**

For the reasons stated above, the Court **GRANTS** Defendants' Motion for Summary Judgment in its entirety.

**SO ORDERED**.

July 25, 2007.

**BARBARA M.G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**